**Martin FRIAS, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 85–66.**

Supreme Court of Wyoming.

June 26, 1986.

Leonard D. Munker, State Public Defender, and Martin J. McClain, Appellate Counsel, Public Defender Program, Cheyenne, and Robert T. Moxley, Wheatland, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Mary B. Guthrie, and John W. Renneisen, Senior Asst. Attys. Gen., for appellee (plaintiff).

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellant Martin Frias was convicted, after trial to a jury, of second-degree murder in the shooting death of his girl friend, Ernestine Perea.

We reverse.

Appellant raises the following issues:
"1. Whether the failure of a juror to answer voir dire questions truthfully deprived appellant of his constitutional right to an impartial jury and his statutory right to peremptory challenges.
"2. Whether the trial court erred in ruling that the physician-patient privilege does not exist in criminal cases.
"3. Whether appellant's conviction was obtained in violation of his constitutional right not to be compelled to give evidence against himself.
"4. Whether the evidence in this case was sufficient to support appellant's conviction of second degree murder.
"5. Whether the trial court erred in denying appellant's motion for a new trial which was based upon newly discovered evidence.
"6. Whether appellant received effective assistance of counsel at his trial such that his conviction was constitutionally obtained."

## FACTS

In the summer of 1984, appellant, an illegal alien from Mexico, was living with Ernestine Perea in a trailer house southwest of Wheatland, Wyoming. Also living there were their two small children and Ernestine's four-year-old daughter from a former marriage.

On July 5, 1984, appellant and Ernestine spent the day apart. Ernestine took the children to a park in Wheatland where she spent the afternoon and evening drinking with friends. The party broke up around 9:30 or 10:00 p.m., and Ernestine and the children went home. Approximately three hours later, Ernestine was found dead in the bedroom of the trailer with a gunshot wound in her stomach and a high-powered rifle lying on the floor next to her.

At trial appellant testified that he arrived home shortly before Ernestine and the children on the night of the shooting. He helped put the children to bed and then prepared his own bed on the couch in the living room. He and Ernestine had gotten into an argument several days before, and, because Ernestine was still angry, appellant had slept on the couch since then. Shortly after Ernestine disappeared into the bedroom, appellant fell asleep. Mo-

ments later, he was awakened by a noise. He got up, looked outside, and checked the children's rooms. Finding nothing, he then went back to bed.

At approximately 1:00 a.m., appellant was again awakened by the sound of a child crying. He followed the cries to the door of Ernestine's bedroom. Inside he saw Ernestine lying on the floor. Her daughter was by her side trying to lift up her mother's head and sobbing uncontrollably. Appellant reached into the room and turned on the light. Ernestine was lying on her back with her head toward the door. She had a gunshot wound in her stomach, and appellant's .300 magnum Weatherby rifle lay next to her. Appellant grabbed the child and ran to the kitchen to call the police. According to appellant and a police officer, appellant was unable to give directions to the trailer in English. He therefore arranged to meet the police at a cafe in Wheatland. Clad only in jeans and accompanied by the child, appellant drove to the cafe, met the police officer, a sheriff's deputy, and the county coroner and led them back to the trailer. While the officers investigated the scene, appellant sat in the kitchen. Upon being informed that Ernestine was dead, appellant attempted to contact someone to take care of the children. He failed to reach anyone, and, therefore, the sheriff's office contacted DPASS, which immediately sent an agent out to get the children. When the initial investigation of the scene was concluded, appellant asked to go with the deputy to the sheriff's office. He voluntarily spent the night there, although he was not under arrest. On July 10, 1984, appellant was arrested and charged with first-degree murder following a two-to three-hour interview with agents of the division of criminal investigation (DCI).

At trial, the prosecution attempted to show that appellant planned and carried out the shooting of Ernestine Perea out of anger and jealousy. In support of its theory, the State called an officer from the Wheatland police department who testified that he was called to appellant's home on two occasions in 1982 to investigate domes-

tic disputes. He testified further that on both occasions Ernestine asked him to remove appellant's rifle from the home. Ernestine's mother testified that her daughter was planning to leave appellant and move back to Cheyenne. A friend of Ernestine, who had been with her at the park on the day of the shooting, testified that appellant drove by the park and saw Ernestine and him "wrestling" in the grass.

The State's case with respect to the actual shooting was entirely circumstantial. The police officer, sheriff's deputy, and coroner who arrived first on the scene testified that, from the position of the body, the location of the rifle, and the blood spatters and bullet fragments in the wall behind her, their initial impression was that the victim had killed herself. However, upon turning the body over and discovering that the wound in the back was smaller than the stomach wound, they concluded that the bullet entered from the back and that the victim could not have fired the gun herself. Further testimony indicated no signs of a struggle in the room, but the victim's pants were ripped along the zipper, and she was bruised around the chest. Her blood alcohol level was .26%. Testimony by the pathologist who performed the autopsy and by members of the state crime lab indicated that the bullet entered the victim's back, passed horizontally through her body, and lodged in the wall. The path of the bullet was parallel to the floor. Members of the state crime lab also testified that the holes in the wall caused by the bullet fragments were about 17½ and 19½ inches from the floor. Given the parallel path of the bullet and the distance of the bullet holes from the floor, state crime lab witnesses concluded that the victim may have been on her knees or squatting and that the gun was approximately 18 to 20 inches off the floor when fired. Other witnesses from the state crime lab testified that although appellant's fingerprints were found on the rifle stock and ammunition box and the victim's prints were found on the rifle scope and barrel,

no identifiable prints were found on the trigger or bolt, or elsewhere on the gun. Vegetable oil and graphite particles were found on the victim's left hand and on the rifle barrel.

In contrast to the State's theory of the case, the defense attempted to show that there was reasonable doubt, in the first instance, as to whether appellant shot Ernestine at all and, in the second instance, as to whether he did it on purpose with premeditated malice.

Testimony demonstrated that appellant cooperated fully with the police. He called them and arranged to meet them to bring them back to the scene. He waited while they investigated. He voluntarily went to the sheriff's office and spent the night there, although not under arrest. Also, prior to his arrest, he agreed to two interviews with agents from DCI, throughout which he steadfastly asserted his innocence. Appellant denied having seen Ernestine wrestling in the park with another man. He thought that the death had been suicide, although he could not explain not having heard the gunshot. He said that he loved Ernestine despite their sometimes stormy relationship.

Three witnesses testified that appellant's right arm was practically useless due to an injury he had incurred a month before. They testified that he could not get dressed by himself or write normally, much less load and fire a rifle.

A therapist from the Southeast Wyoming Mental Health Center testified that at the request of a DCI agent, she met with the four-year-old child who first discovered the victim. During that session, the child indicated at first that appellant shot her mother. Then, suddenly, she exclaimed, " 'I shot her in the back. I shot her in the back. I shot her in the back.' " The child also told the therapist that she knew how to work a safety on a gun. Finally, the therapist described the following conversation with the child:

" * * * I asked [her], 'Did you talk to your grandma about what we talked about?' And she said, 'Un-huh.' And I said, 'What did grandma say about that?' And she said, 'Sh-sh-sh-sh-sh.' And we went out and got a pop out of the machine and she chanted the whole way, 'I can't tell you, I can't tell you, I can't tell you, I can't tell you, I can't tell you.' * * * "

A psychiatrist who also examined the child described her as very aggressive with symptoms of deprivation. At one point during the examination, the child took a note pad and ran it across the psychiatrist's neck saying, " 'I cut your neck off.' " She repeated this game several times.

Ernestine's best friend testified that Ernestine had tried to commit suicide on five occasions prior to her death. The first four times she attempted to cut her wrists with a knife. The last time she attempted to drive her car off the highway in an effort to have an accident.

The former director of the state crime lab testified that, based on his evaluation of the State's forensic evidence, no substantial inculpatory or exculpatory evidence had been found. He found in the items of physical evidence nothing from which to draw a specific conclusion as to what happened.

At the close of the evidence, the case was submitted to the jury. Approximately five hours later, the jury found appellant guilty of second-degree murder. On December 13, 1984, appellant moved for a judgment of acquittal and, in the alternative, for a new trial. Following a hearing, the motions were denied.

On May 31, 1985, appellant moved the district court for a new trial on the basis of newly discovered evidence. In support of his motion, appellant offered the testimony of several witnesses who, upon evaluating the evidence available to the State's witnesses, concluded that the bullet was fired in direct contact with the victim's body, that it entered the body through the stomach, and that it exited through the back.

In its decision letter of July 10, 1985, the trial court found that (1) all of the evidence presented at the hearing was available to

the defense at the time of the trial; (2) counsel for appellant had not used due diligence in an attempt to discover it sooner; (3) the evidence was cumulative and could be used only to impeach or contradict evidence produced at the trial; and therefore, (4) the evidence was not sufficient to support a new trial.

## I

In his first assignment of error, appellant claims that he was deprived of his constitutional right to an impartial jury and his statutory right to peremptory challenges in that one of the jurors failed to answer voir dire questions truthfully.

During the voir dire examination, the State asked members of the jury panel if any of them had a close relationship with appellant or knew him personally. Three jurors volunteered that they did, and each of them was later excused from the jury. The juror about whom appellant now complains was not among those three. During the course of his voir dire examination, counsel for appellant cursorily raised the question again in the following manner:

"Now, there is some of you, at least one person indicates that he does know my client, Martin. Are you the only juror that does know of—okay, there [are] two. All right, let's get your names so the court reporter has them."

After the jury was selected but before it was sworn, the following proceedings took place in chambers:

"[COUNSEL FOR APPELLANT]: Sorry to put you on the spot like this.

"THE COURT: It's not actually putting you on the spot, [juror]. You're Mitch and Murray's dad; is that right?

"[JUROR]: Right.

"[COUNSEL FOR APPELLANT]: Martin works with Mitch and Murray and has some conflicts with them. Were you aware of that?

"[JUROR]: No.

"[COUNSEL FOR APPELLANT]: Martin was just uncomfortable because he had some conflicts with Mitch.

"[JUROR]: None that I knew of.

"[COUNSEL FOR APPELLANT]: So you're not uncomfortable about sitting on Martin Frias' jury?

"[JUROR]: No, I have no feeling one way or the other.

"[COUNSEL FOR APPELLANT]: Okay.

"THE COURT: Thank you.

"[COUNSEL FOR APPELLANT]: It doesn't bother me then.

"THE COURT: Thank you very much, [juror]."

Then, during his closing argument, counsel for appellant made the following comments:

"* * * When I picked you jurors it took me thirty minutes from the beginning of my voir dire to the completion of voir dire. I talked with some of you individually, but generally as a group. I looked for a touch of reason and a sense of fairness. I saw it then, I see it now. I didn't have any problem with any of you. * * *"

After his conviction, as one of the grounds for his motion for judgment of acquittal or for a new trial, appellant claimed that he had been denied an impartial jury by the failure of the juror to disclose a possible conflict of interest. At the January 3, 1985, hearing on the motion, appellant testified that he had worked with the two sons and son-in-law of the juror in question and that there had been difficulty between them because of appellant's position as their foreman. At the conclusion of the hearing, the trial court found that:

"* * * [The juror] came into chambers and we gave [counsel for appellant] ample opportunity to question him and as we left this room, the Judge's chambers that day, everyone agreed that he could remain on the jury."

This Court has repeatedly recognized the right of a defendant to an impartial jury. *State ex rel. Hopkinson v. District Court, Teton County*, Wyo., 696 P.2d 54, cert. denied —— U.S. ——, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985). However, the defendant has the burden of demonstrating

the partiality or bias of a juror. *Lopez v. State*, Wyo., 544 P.2d 855 (1976). The defendant has the obligation to examine prospective jurors on voir dire and discover by proper investigation facts affecting their qualifications and then to seasonably raise an objection with respect to any member of the panel. *Lopez v. State*, supra.

■ Appellant's examination of the jury panel as a whole was cursory at best. So, too, was his examination of the juror in question in chambers following jury selection. Despite his knowledge of the juror's potential bias, appellant failed to raise any objection to the juror until after the jury rendered its verdict. Appellant had more than one opportunity prior to trial to question the juror directly and plainly about any potential bias or partiality. His failure to do so, in combination with his unqualified acceptance of the juror, constitutes a waiver of his right to object now. *Lopez v. State*, supra.

## II

■ Appellant's second contention is that the trial court erred in ruling that the physician-patient privilege does not exist in criminal cases. We agree with appellant but find that his failure to object below constitutes a waiver of his right to object now. 81 Am.Jur.2d, Witnesses § 274 (1976).

At trial, the State introduced evidence that on May 1, 1984, two months before the shooting, appellant broke his right arm in two places. A pin had been inserted through the break in the upper arm. Appellant rebroke the upper arm and bent the pin approximately 18 days before the shooting. On June 21, he had surgery to straighten the pin and was still wearing a sling at the time of the shooting. Appellant's physician testified that despite the injury, appellant could have held the rifle, operated the bolt action, and fired the weapon using the injured arm. Prior to this testimony, counsel for appellant objected for lack of foundation. No objection was made on the basis of the physician-patient privilege.

In the absence of a contrary provision, statutes establishing a privilege are said to apply in civil and criminal cases. 81 Am. Jur.2d, Witnesses § 246 (1976).

Section 1–12–101, W.S.1977, provides in pertinent part:

> "(a) The following persons shall not testify in certain respects:
>
> "(i) * * * [A] physician concerning a communication made to him by his * * * patient in that relation, or his advice to his * * * patient. The * * * physician may testify by express consent of the * * * patient, and if the * * * patient voluntarily testifies the * * * physician may be compelled to testify on the same subject; * * * "

Rule 20(a), W.R.Cr.P., provides in pertinent part:

> "Except as otherwise provided, the provisions of the Wyoming Rules of Civil Procedure and the Code of Civil Procedure, relative to or compelling the attendance and testimony of witnesses * * * shall extend to criminal cases * * *."

On the basis of these provisions and the general rule applicable to privileges, we hold that the physician-patient privilege does apply in criminal cases.

■ However, the rule is also well established that the privilege must be claimed and the evidence objected to or the privilege is waived. *State v. Mincey*, 141 Ariz. 425, 687 P.2d 1180, cert. denied — U.S. ——, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984). Waiver also occurs when a party voluntarily inserts the issue of his physical condition into the litigation. *Iseman v. Delmar Medical-Dental Building, Inc.*, 113 A.D.2d 276, 495 N.Y.S.2d 747 (1985). In the present case, appellant failed to claim the privilege during the doctor's testimony. In addition, during the cross-examination of witnesses for the State who testified prior to the doctor, appellant raised the issue of his physical condition and ability to handle and fire a rifle. For these reasons, we find that appellant waived any privilege that may have been applicable here.

### III

Appellant next complains that his conviction was obtained in violation of his constitutional right to not be compelled to give evidence against himself. More specifically, appellant complains that the trial court erred in failing to instruct the jury to disregard the tape containing the interrogation of appellant by agents of DCI. The record reflects that before the tape was played, counsel for appellant moved that the jury be allowed to hear the tape as opposed to reading a transcript of the interrogation. On the basis of that motion, the trial court stated:

"Gentlemen, before we play this tape, I want it on the record that I could and would review the tape prior, but that it is a long tape and the parties have stipulated that the jury can hear it with the Court, and that I will rule on it after we all hear—or make an instruction to the jury if I find that the interrogation was not voluntary."

After the jury heard the first tape of the interrogation in its entirety, counsel for appellant moved for suppression of the tape on the grounds that it was coercive and, therefore, involuntary. The trial court denied the motion and allowed the second tape to be played before the jury. During that portion of the interrogation, appellant changed his previous story as to when he arrived home. On the night of the shooting, he told the coroner that he arrived home after Ernestine and the children were already in bed. During the interrogation, he said that he arrived home shortly before Ernestine and the children.

When the second tape had been played, counsel for appellant again requested suppression of the tape or a cautionary instruction. The trial court agreed to give a cautionary instruction and offered the following comments:

"Gentlemen, you know, that [the agent] is terrible. I think it is—*I think it's coercive as hell.* * * *

"* * * *I think it's destructive as hell, and I think [the agent's] attitude during this interrogation was poorly done.*

*I think he browbeat the guy, obviously scared him to death.*

\*　　\*　　\*　　\*　　\*　　\*

"* * * [T]he threats, the penitentiary, the taking his kids away from him are all pretty heavy kinds of stuff to put on a guy who is sitting there with two people after him." (Emphasis added.)

When the State formally moved for admission of the two tapes, the trial court granted the motion over appellant's objection.

At the close of the case, the trial court gave the following instruction:

"Statements, if any, made by the Defendant charged with the crime, shall be considered by you only if you find that such statements were made voluntarily in whole or in part. If you find such statement is involuntary then you must reject it. If you find it is voluntary in part, you must consider that part of the statement which you find to have been voluntary.

"A voluntary statement is to be considered by you together with all other evidence in determining the guilt or innocence of the accused and you may give the statement such weight and credibility as you see fit.

"If you find that Defendant was coerced into making a statement you may disregard the statement entirely."

In determining whether statements made by an accused are voluntary, the totality of the circumstances surrounding the interrogation must be examined. *State v. Sands,* 145 Ariz. 269, 700 P.2d 1369 (1985); *State v. Cochran,* 72 Or.App. 499, 696 P.2d 1114 (1985); *State v. Radjenovich,* 138 Ariz. 270, 674 P.2d 333 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, cert. denied 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983). In the recent case of *Moran v. Burbine,* —— U.S. ——, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986), the United States Supreme Court stated:

"Echoing the standard first articulated in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that '[t]he defendant may

waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' 384 U.S. [436], at 444, 475, 86 S.Ct. [1602], at 1612, 1628 [16 L.Ed.2d 694 (1966)]. The inquiry has two distinct dimensions. [Citations.] First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.* [Citations.]" (Emphasis added.)

Applying this two-dimensional inquiry to the present case, we are unable to find either an uncoerced choice or the requisite level of awareness to conclude that appellant waived his *Miranda* rights. Appellant is an illegal alien from Mexico. He has lived in the United States for only nine years. His knowledge and control of the English language are limited. His understanding of the American justice system is more so. That he did not understand what was happening to him during the interrogation is demonstrated by the following testimony given at trial:

"Q. * * * What was your understanding in July when you chose to talk about your case? Did you have an understanding that you didn't have to?

"A. The only thing I know that I have to. I have to testify because I was the only suspect, I guess.

"Q. You felt obligated to?

"A. Yes, sir.

"Q. You felt compelled to?

"(The witness nods head to indicate the affirmative.)

"Q. You wanted to?

"(The witness nods head to indicate the affirmative.)

"Q. But did you understand that you didn't have to?

"A. I don't really understand that I don't have to. I just—I don't understand the police officers. That is what they wanted off you, to make you talk, or—I mean, really, you don't have to, but I was voluntary to say what was inside me.

"Q. Well, do you understand today is the important day, Martin, because you do have a jury? Do you understand that you are under oath today?

"A. Yes, sir.

"Q. Were you under oath then? Do you know what I am even talking about, Martin?

"A. Before—

"Q. On July 10th, had you taken an oath? Had you sworn to tell the truth?

"A. Yes.

"Q. Did somebody give you an oath? Do you understand what an oath is?

"(The witness shakes head to indicate the negative.)

"Q. Okay, when you walked in here before you took the witness stand, who gave you the oath?

"A. You did, sir.

"Q. No, I didn't give it to you. Who gave you the oath?

"A. Can I have somebody to help me?

"Q. No, nobody is going to help you. I want to know what you understood. Who gave you the oath? It just happened just five minutes ago. Who swore you in to tell the truth?

"A. Myself, sir.

"Q. No, you didn't swear yourself in. Who gave you the oath?

"A. I don't understand what is the word.

"Q. Do you know what an oath is?

"(The witness shakes head to indicate the negative.)

"Q. Okay, let's talk about what an oath is then."

Despite appellant's obvious difficulty understanding what was happening, his interrogators seriously downplayed the importance of the *Miranda* warnings. Although they gave lip service to the warnings, they did not attempt to impart a clear and understandable interpretation of the warnings in light of appellant's ethnic background, education, and lack of familiarity with the workings of the American justice system. When informed of his right to remain silent, appellant replied, "What do you mean?" His interrogators did not repeat the warning but proceeded on with the next one. Although an interpreter was present to repeat the warnings in Spanish, his use of the Spanish language was, as the trial court noted, not very good. When the "formalities" were concluded, the interrogators excused the interpreter and began their interrogation. For the next two to three hours, appellant was confronted with a barrage of accusations and threats. His interrogators repeatedly accused him of lying. They threatened him with the loss of his children and incarceration in the penitentiary unless he changed his story. Again and again they told him they had evidence which proved that he shot Ernestine. Throughout their questioning, they laid out the State's entire theory of the case for which they had little, if any, proof. And the jury heard their story. The jury heard them say they had evidence which they didn't have. The jury heard them say they had proof that appellant shot Ernestine Perea. Yet no one told the jury that the interrogators' comments were not evidence, that they were not made under oath, and that they were not necessarily true.

 Despite the trial court's conclusion that the interrogation was "coercive as hell," the tape was played before the jury in its entirety, and the jury was left to decide whom to believe—the interrogators who were agents of the State whose English was clear and understandable and who presumably knew what they were talking about, or Martin Frias, an illegal alien from Mexico whose English was broken and difficult to follow and who did not understand

that he had the right to remain silent. Pursuant to the trial court's instruction, the jury was also left with the responsibility of determining whether appellant's statements were voluntary. The voluntariness of a defendant's statements is a mixed question of law and fact. *Williams v. Maggio,* 727 F.2d 1387 (5th Cir.1984). Appellant's waiver of a separate hearing on the question did not relieve the trial court of its duty to determine whether his statements were voluntary. In *Dodge v. State,* Wyo., 562 P.2d 303 (1977), we held that because voluntariness appeared on the face of the record with unmistakable clarity, the trial judge was not required to make an express finding of voluntariness. We noted, however, that "it would be a better practice to do so" and suggested "there may be some occasion arise in the future in which we can now foresee such a determination would be critical, particularly if the evidence were seriously in dispute." 562 P.2d at 309. We have precisely such an occasion before us now. The evidence of voluntariness is seriously in dispute. This is not a case where voluntariness appears on the face of the record with unmistakable clarity. We will not presume that the trial judge must have concluded that the statements were voluntary from the bare fact that he admitted them into evidence. Where the evidence of voluntariness is seriously in dispute, the trial court must expressly find that the statements were voluntary. Because the trial court failed to do so here, we hold that appellant's statements are inadmissible.

## IV

Appellant next complains that the evidence was insufficient to support the conviction of second-degree murder. Because we reverse on other grounds, we find it unnecessary to address the sufficiency of the evidence. *Campbell v. State,* Wyo., 709 P.2d 425 (1985).

## V

 In appellant's fifth assignment of error, he claims that the trial court erred in

denying the motion for a new trial on the basis of newly discovered evidence.

At the hearing on the motion, appellant called a photographer and ex-employee of the state crime lab, who testified that infrared photographs revealed black residue on the front of the victim's blouse consistent with gun powder residue, indicating that she was shot in the stomach, not in the back. Appellant also called a forensic pathologist who testified that the homicide conclusion was premature, arrived at in haste by laymen, and absolutely indefensible. He testified further that, in his opinion, the victim was in a sitting position, and the rifle was in front of her and in close proximity, if not abutting the skin of the abdomen.

Finally, appellant called the chief medical examiner and director of the regional crime laboratory in San Antonio, Texas. He testified that, given the victim's prior attempts at suicide, the possibility that she had taken her own life should have been carefully considered and thoroughly investigated. With that consideration in mind and upon reviewing the evidence available to the State's witnesses, he testified that:

" * * * [A]t the time she shot herself she was sitting down, bent slightly over the weapon. She probably used her toe to trigger the weapon. She could have used her finger, but she was bent over with her legs extended.

"The bullet entered her abdomen. It was a contact wound, went out the back. By the time it started to come out the back, there had been a separation of the jacket and core."

In *Opie v. State*, Wyo., 422 P.2d 84, 85 (1967), this Court clearly outlined the test for determining whether a new trial should be granted on the grounds of newly discovered evidence:

" * * * (1) That the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted;

and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial. [Citations.]"

In order to satisfy the *Opie* test, appellant must demonstrate the existence of each of the four elements. In the present case, appellant fails to demonstrate that it was not owing to a want of due diligence that the evidence of suicide did not come to his knowledge sooner.

Counsel for appellant was fully aware, prior to trial, that evidence existed dictating against the conclusion that appellant shot Ernestine Perea. On the night of Ernestine's death, appellant called the police, agreed to meet them at a cafe, led them back to the trailer, waited while they investigated the scene, and then voluntarily accompanied them back to the jail where he spent the night. Prior to his arrest, appellant agreed to talk to agents from DCI. Throughout the interrogation, appellant steadfastly denied killing Ernestine despite repeated accusations and threats by his interrogators.

The physical therapist who worked with appellant following the injury to his arm testified that it would have been difficult for him to load or fire the gun. This testimony was confirmed by the jailer at the Platte County sheriff's office who observed appellant daily following his arrest. He testified that, in his opinion, appellant could not have raised the gun to his right shoulder and pulled the trigger. He described appellant's right arm as almost useless.

Although appellant's fingerprints were found on the stock of the rifle, they were not found in the vicinity of the gun where he would necessarily have had to touch in order to fire it. The position of the body, the blood spatters, and the bullet fragments were inconsistent with the theory that the victim was shot in the back. The initial impression of the sheriff's deputy, police officer, and county coroner was that the victim committed suicide. Testimony of the victim's best friend indicated that she had tried to commit suicide on at least five occasions prior to the shooting. De-

spite the quantity of evidence indicating that appellant did not shoot Ernestine Perea, counsel for appellant simply accepted the validity of the prosecution's case and failed to conduct an independent investigation into the possibility of suicide.

This is not a case in which appellant has failed to establish exactly what further evidence existed for counsel to discover if he had exercised due diligence. See 2 LaFave & Isreal, Crim.Proc. § 11.10(d) at 25 n. 76.5 (1986 Pocket Part), for cases to the contrary. Information was available to counsel which indicated that Ernestine Perea may have committed suicide. This is obvious from the ease with which counsel obtained that information after appellant's conviction. There is no satisfactory reason as to why it could not have been discovered just as easily before trial. The testimony of experts to refute the State's theory was crucial to the defense. With little effort, counsel could have secured that testimony prior to appellant's conviction. We can find no sound justification for his failure to do so and, therefore, find that he did not exercise due diligence.

## VI

■ In his final claim of error, appellant asserts that he did not receive effective assistance of counsel, and, therefore, his conviction was not constitutionally obtained. The standard by which we determine whether assistance of counsel is effective is one of reasonableness. *Munden v. State,* Wyo., 698 P.2d 621 (1985); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). That is, we must determine whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Strickland v. Washington,* 104 S.Ct. at 2066. Under this standard, appellant must demonstrate

"* * * first * * * that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed [appellant] by the Sixth Amendment. Second, [appellant] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [appellant] of a fair trial, a trial whose result is reliable. * * *" 104 S.Ct. at 2064.

Appellant's claim in the present case rests primarily upon trial counsel's failure to investigate and discover facts supporting a potential suicide defense until after appellant's conviction. The United States Supreme Court has outlined trial counsel's duty to investigate as follows:

"* * * [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* * * *

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. * * * [W]hat investigation decisions are reasonable depends critically on such information. * * *" (Emphasis added.) *Strickland v. Washington,* 104 S.Ct. at 2066.

The reasonableness of investigation decisions depends on other evidence as well. "[I]n those cases involving claims of inadequate investigation * * * consideration [must be given to] the strength of the evidence known to counsel that suggested further inquiry was needed." 2 LaFave & Isreal, Crim.Proc. § 11.10(d) at 25 (1986 Pocket Part).

In the present case, appellant repeatedly denied any involvement in the death of Ernestine Perea. His actions on the night of the shooting and the days which followed did not comport with those of a man who had killed the woman he loved. Coun-

sel was aware early on that appellant's explanation for Ernestine's death was that she shot herself. The evidence showed that she had attempted suicide at least five times before her death. The initial impression of those who investigated the crime scene was that the victim committed suicide. The position of the body and the location of the blood spatters and bullet fragments were inconsistent with the theory that the victim was shot in the back. Expert witnesses for the State acknowledged the possibility that if the barrel of the rifle was held close to the body, the entry wound could be larger than the exit wound.

Despite this evidence, counsel did not seek other opinions. His investigation of the suicide defense prior to appellant's conviction consisted almost exclusively of conversations with witnesses for the State. On the basis of the opinions of those witnesses, counsel all but abandoned the potential suicide defense. He simply accepted the validity of what the State's experts said and failed to conduct an independent investigation. In light of the entirely different version of the events presented by appellant and the evidence supporting that version, we fail to see the reasonableness of the decision. We, therefore, find that counsel's assistance was ineffective.

As further support for our holding, we point to the rule that:

" * * * [O]ne glaring, obviously non-tactical error may cast doubt on whether counsel's decisions in other matters truly reflected a tactical choice. Similarly, though counsel's failure to exercise any one of several defense rights might be viewed as tactical, taken together his several omissions may clearly indicate that he simply had abdicated his responsibilities. * * * " 2 LaFave & Isreal, Crim.Proc. § 11.10(c) at 103 (1984).

In the present case, trial counsel's decision to not investigate further a possible suicide defense was not his only questionable decision. As indicated earlier, despite counsel's awareness of one juror's possible bias against appellant, he raised no objection and in fact agreed to allow the individual to remain on the jury. More importantly, in what might have been intended as a tactical maneuver, counsel waived appellant's right to a separate hearing on the voluntariness of his taped statements, thereby allowing the jury to hear the State's version of what happened, part of which found little support in the record. These actions by counsel strengthen the conclusion that his decisions were far less strategic than they were the result of inadequate preparation and investigation.

We now turn to the second dimension of the reasonableness test. As indicated above, it is not enough that appellant has demonstrated that his counsel's performance was ineffective. To obtain the relief he seeks, he "must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 104 S.Ct. at 2064. That is, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 104 S.Ct. at 2068. There is no question that under the particular facts and circumstances of this case, counsel's failure to investigate the suicide defense undermines confidence in the outcome. Testimony of experts to refute the State's theory that the victim was shot in the back was crucial to the defense. Without such testimony, there could be no suicide defense. The uncontroverted testimony of the State's experts that the entry wound was in the back precluded any possibility that the victim fired the gun herself. Expert testimony that the bullet entered the stomach may have altered the entire evidentiary picture. Other evidence demonstrated the victim's suicidal tendencies. Testimony that the bullet entered the stomach would have buttressed the initial impression of investigators that the victim committed suicide and would have been consistent with the position of the body and the location of the blood spatters and bullet fragments. Having considered the totality of the evidence before the jury, as we are required to do,

we hold that appellant has demonstrated a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different.

 This is not the first time we have been asked to decide the question of ineffective assistance of counsel. *Munden v. State*, supra; *Osborn v. State*, Wyo., 672 P.2d 777 (1983), cert. denied 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984). We are, therefore, aware of the tremendous reluctance among appellate courts to find trial counsel ineffective. There can be no doubt that "[i]t is extremely difficult to assess counsel's performance on the basis of a 'cold appellate record.'" 2 LaFave & Isreal, Crim.Proc. § 11.10(a) at 95 (1984). Because of the variety and number of concerns which flow from a finding of ineffectiveness, see 2 LaFave & Isreal, supra, findings of ineffectiveness are infrequent. For all of these reasons, when faced with an ineffectiveness claim, appellate courts must give great deference to trial counsel's performance. *Munden v. State*, supra.

"* * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Strickland v. Washington*, 104 S.Ct. at 2065–2066.

However, the presumption does not automatically immunize an attorney's performance from a Sixth Amendment challenge. Against the presumption of effectiveness, we must balance the ultimate focus of an effectiveness inquiry: the fundamental fairness of the proceeding.

"* * * In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." 104 S.Ct. at 2069.

Applying these governing principles to the particular facts and circumstances of this case, we have no choice but to reverse and remand for a new trial.

URBIGKIT, Justice, concurring.

I concur. Additionally, pursuant to Art. 1, § 6 of the Wyoming Constitution, relating to rights of a defendant to be distinguished from responsibilities for representation by counsel when derived from any diligent inquiry, I would hold that the motion for a new trial based on newly discovered evidence should have been granted by the trial court. Plain error and violation of basic constitutional protection should not be eclectically distinguished in application of undenied rights for a fair trial or the availability of fundamental justice.

Sometimes the pathway to that constitutionally provided opportunity for justice can be more clearly perceived in retrospective contemplation, and consequently the inadequacy of desired signal lamps should not be chargeable primarily to the accused.

THOMAS, Chief Justice, dissenting.

I would affirm Frias' conviction in this case. The majority concludes that Frias' statements were inadmissible because the district judge failed to make a finding of voluntariness. The majority also holds that although the claimed newly-discovered evidence did not meet the standards previously articulated by this court the failure to earlier obtain the evidence constituted ineffective assistance of counsel, and the defendant is entitled to a new trial for that reason.

In addressing the voluntariness of Frias' statement and the conclusion that error occurred, a further analysis of the record is appropriate. Counsel for Frias insisted that the tapes be played to the jury rather than reading a transcript to them. Then counsel for Frias waived any in-chambers hearing of the tapes by the trial judge and insisted that the trial judge listen to the

tapes at the same time as the jury. Counsel argued that the court then could rule upon the admissibility of the statements by Frias, and the prosecutor ultimately agreed to this plan. No objection was lodged by defense counsel until after the first tape was played, but the trial judge then decided to let the other tape be played for the jury as well. Following the playing of both tapes for the jury defense counsel argued that the interview recorded on the tapes was coercive and that the investigators were exaggerating their proof against Frias during the course of the interrogation. At that time defense counsel requested the trial judge to suppress the statement or instruct the jury with respect to it, and the trial judge advised counsel that he would be happy to give a cautionary instruction. The instruction which was requested in chambers was, "What you heard is an example of interrogation that has gone over the line. I'm asking you to disregard it." The court then advised:

"I think what I'm going to do is just let the tape go with some cautionary instruction at the end maybe along the lines both of you suggested without going quite as far as Mr. Munker would have me go, but maybe a little further than you would suggest too. But we'll all have to work on that instruction."

During the conference in chambers, when the prosecution moved for admission of the tapes, counsel for the defendant stated:

"I would renew the objection. The Court heard our objection and has indicated its ruling. In the event the Court allows the tapes to stand as being admissible, they have been heard by the jury, I would ask that the Court give a cautionary instruction."

The instruction conference was not reported, but the district judge said:

"We have agreed upon the instructions and there has been no objection to the instructions."

The instruction which was given is quoted at page 141 of the majority opinion. It does not caution the jury to disregard the statements of the investigators made on the tapes which indicated that they had stronger proof than was introduced at trial. This seems to be the focus of one of Frias' main contentions with respect to the introduction of the tapes. The record, however, is silent with respect to the offering of any such instruction by Frias and also is silent with respect to any objection to the instruction which was given on the grounds that it did not caution the jury to disregard the statements of the investigators on the tapes. Under well-documented authority Frias has waived this claim on appeal. Furthermore, in my judgment the strategy of defense counsel also resulted in a waiver of error. For me the record is clear that defense counsel wanted the tapes played to the jury. In fact, defense counsel said:

"I think it's coercive and I think this jury who's heard it—and that was one of the reasons why I didn't feel uncomfortable with the jury hearing it. I think they can understand it."

Certainly I would trust the jury in that regard.

There is only one aspect of Frias' statement that could be perceived as incriminatory. At one point he said that on the fatal night he arrived home shortly before Ernestine and the children although on that night he had told the coroner he arrived home after Ernestine and the children already were in bed. He then explained in the statement how he had helped Ernestine get the children ready for bed. This seems to be the only information which Frias gave in his statement that might incriminate him. In this regard the district judge observed about the tapes:

"Gentlemen, you know, that [agent] is terrible. I think it is—I think it's coercive as hell. I think, unfortunately, the one part of it that wasn't coercive is where he admitted that he lied where [the agent] questioned him, and very casually admits that he lied about the time that he got home and that they got home together."

The materiality of this discrepancy escapes me, but I cannot believe that any juror

would attribute any particular significance to it.

The majority opinion recognizes the totality of the circumstances test. It then discusses the question of whether there was a valid waiver of the appellant's constitutional right to be interrogated without the presence of counsel. I do not understand that Frias asserted such an error in this appeal. Because of my perception of Frias' statement as essentially exculpatory, I do not see any purpose in inquiring into voluntariness. It appears that the district judge was, and to a degree this court is, concerned with the coercive nature of the interrogation. However one might perceive or describe the degree of duress involved it was unsuccessful. "[A]ppellant steadfastly denied killing Ernestine despite repeated accusations and threats by his interrogators." Consequently, the tactics of the interrogators do not rise to the level of reversible error, and I believe that any fair observance of the separation of powers doctrine inhibits this court from furnishing direction as to the manner in which investigative agents for the executive branch do their work unless it reaches the level of error of law.

There were two tapes involved in Frias' statement, and after the first had been played counsel for Frias requested that the court rule that the interrogation was involuntary and that the second tape not be played. The second tape contained the information changing the time of arrival home. I do not understand that the attorneys employed by the Wyoming Public Defender's office are anything other than skilled and dedicated practitioners. In my view the goal that was sought was to play the first tape with Frias' repeated denials of killing his wife for the purpose of presenting his position to the jury, achieving sympathy for Frias because of the overreaching manifested by the interrogators, and preserving an option for Frias not to testify. I think the strategy was sound but the tactics did not evolve as counsel had hoped. Nevertheless, I am persuaded that the approach taken when later coupled to a complaint with respect to the admissi-

bility of the statement is a manifestation of gamesmanship to which the majority of the court has yielded. While we all recognize that defendants in criminal trials are afforded many prerogatives not available to other litigants, I am very reluctant to reward gamesmanship.

With respect to the reversal granted Frias because of ineffective assistance of counsel I have the same fundamental reaction. The public defender's office endeavored to structure an interesting fork in arguing that a new trial should have been ordered because of newly-discovered evidence or alternatively the court must find that a new trial should be granted because of ineffective assistance of counsel. I am inclined to question the wisdom of yielding to the importunities of Frias in this regard. I know of no other area of the law in which one is permitted to confess error in order to achieve an advantage. I am highly suspicious of structuring any opportunity for counsel for a defendant to claim error in the record; and if that claim is discounted, as it is here, then say, "Well, this must have happened because I was a bad lawyer."

On review courts accommodate to a broad range of professional competence when the question of ineffective assistance of counsel is raised. In this instance, I do not find that the suicide defense was "all but abandoned." Evidence was introduced with respect to the victim's past suicide attempts. Defense counsel got the experts for the State to agree that an entry wound might be larger than an exit wound. Counsel for Frias went into the inconsistencies between the State's theory and the position of the body and the blood spatters all during the course of this trial. It was clear that the initial impression of the investigating officers was that the victim had committed suicide. Frias took the stand and denied killing Ernestine, and he said that he first thought and still thought that she had killed herself.

The claimed newly-discovered evidence would have strengthened these proposi-

tions. It was thus cumulative of what already had been placed before the jury by evidence, impeachment or justifiable inference. Furthermore, it was not necessarily solid evidence. Only one of the experts did not equivocate in his conclusion that the shot was fired from the front of the victim. The additional evidence in toto was not as conclusive as the majority would indicate.

Furthermore, the record demonstrates that defense counsel relied upon the defense investigator's conclusion that the shot was fired into the back of the victim when the decision was made not to pursue further investigation. This was the individual who was the former director of the State crime lab. In his affidavit in support of the motion for new trial he advises that he did not interview Dr. Stahl, the pathologist, but that independently he had determined that the victim was shot in the back. With this information it was not unreasonable for defense counsel to conclude not to pursue any additional investigation or expert testimony in this regard. Frias still was able to mount his suicide defense in spite of his own investigator's conclusion that the victim was shot in the back.

In *Opie v. State*, Wyo., 422 P.2d 84 (1967), this court justified the stance it took on newly-discovered evidence in part based upon a social need for finality even in criminal cases. See *Grable v. State*, Wyo., 664 P.2d 531 (1983). I cannot approve a decision which adheres to the concepts of *Opie v. State*, but in the same breath grants a new trial because of a conclusion that the failure to present the evidence initially manifests ineffective assistance of counsel. In effect the rule espoused by this court with respect to newly-discovered evidence has been completely undermined.

I do not understand that counsel for the defendant failed in any way to make an adequate investigation or to make rational and appropriate choices based upon the information derived from the investigation. In my judgment the test posed in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), was satisfied. The majority seem to agree that the claimed newly-discovered evidence was cumulative, impeaching or simply contradictory of the other evidence submitted at trial. I then remain unpersuaded that the second prong of the *Strickland* test was satisfied by any showing that the errors were so serious as to deprive Frias of a fair trial.

With respect to the other matters relied upon as demonstrating ineffective assistance of counsel, I do not agree that this is true. As I indicated I think the defense wanted the jury to hear how Frias was badgered during the interrogation. Consequently, the waiver of the voluntariness hearing was not a mistake but a matter of trial tactics. There was no error with respect to the handling of the juror, and his bias was not demonstrated by the in-chambers hearing. Again, it may have been a well-calculated decision to leave that individual on the jury. Finally, I am not satisfied that the outcome of the trial would have been different if the new evidence had been admitted. There is no reason to believe that this expert testimony would have been swallowed hook, line and sinker by the jury.

I am satisfied about one proposition, however, and that is that it is a fundamental mistake to attempt to test those issues by simply examining the trial record and applying the subjective responses of an appellate court. In my judgment effective assistance of counsel can only be tested upon a motion for post-conviction relief at which a hearing can be held to determine what the facts were with respect to the efforts of defense counsel. What counsel did in this case is largely a matter of speculation, conjecture and opinion. I suggest that if Frias at any point admitted to his counsel his involvement in his wife's death what was done becomes much more readily understandable. It is very difficult to set out to produce evidence of a proposition that one knows is not true. Normally that effort is fruitless. Consequently, I believe that an evidentiary hearing is the only appropriate way to test the effective assist-

ance of counsel, and in my judgment wisdom dictates that it be dealt with only in that context.

For these reasons, I would find no error in the admission into evidence of Frias' exculpatory statement, nor would I find that there was ineffective assistance of counsel. I would affirm the conviction.

The majority concluded that it was not necessary to deal with the sufficiency of the evidence argument. Because I would vote to affirm, perhaps it is helpful to explain that there certainly was sufficient evidence in this case to support the jury's finding of guilty. Consequently, if addressed, that claim of error would not have produced any affirmative relief for Frias.