**Anthony LAING, Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 86–202.

Supreme Court of Wyoming.

Dec. 10, 1987.

Dallas J. Laird (argued) and John D. Whitaker, Casper, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Karen A. Byrne, Asst. Atty. Gen. (argued) for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellant was convicted of aggravated assault and battery in violation of § 6–2–502, W.S.1977 (Cum.Supp.1987). Imposition of sentence was delayed under § 7–13–203, W.S.1977, and appellant was placed on probation subject to several conditions, one being that he serve six months in the county jail. On appeal, he contends that he did not receive effective assistance of counsel and that the trial court erred by imposing a jail term as a condition of his delayed sentence.

We affirm appellant's conviction and modify his sentence.

On July 26, 1985, Officer James Jongsma of the Casper Police Department stopped a brown Mercedes for a license plate violation. The Mercedes was driven by appellant's brother, Robert Laing. After discovering that Mr. Laing possessed neither a driver's license nor any evidence of ownership of the car, Officer Jongsma asked him to get into the back seat of the police car. The officer then ran a check on the license plate and found that it was registered to another person and a different vehicle. The officer told Mr. Laing that he was going to take the rear license plate from the Mercedes. The officer unsuccessfully tried to remove the license plate by hand and then returned to his patrol car to get a pocket knife. He partially opened the patrol car door and, while leaning across the seat to get the knife, looked in his rear view mirror and saw appellant's dark brown pickup truck approaching. Officer Jongsma testified that he

"recognized the truck from an earlier stop, recognized the driver of the truck, and saw the truck make a move or cor-

rection, it veered slightly, as if it was lining up and the thing that registered on my mind was I know the truck, I know it is Tony Laing, and I saw him move, I thought he is lining up to hit me, and I then dove into the car in order to get out of his way."

Officer Jongsma further testified that he saw a "determined look" on appellant's face as he approached. Appellant's truck hit the door of the police car and twisted it. After the accident, appellant told the officer that he was looking in the back of his truck at his dogs when the collision occurred. He also told the officer that he should not park with his door open. Officer Jongsma then arrested appellant.

The officer testified that he recognized appellant and his truck from an earlier incident when he had stopped appellant and cited him for having no registration and no driver's license. He recalled that during the traffic stop, appellant had told him that he could "make more trouble for me than I would ever know what to do with."

After the collision, appellant was interviewed by Officer James Cooper and signed a statement prepared by the officer. In the statement, appellant indicated that he had passed the police car on the other side of the road; he noticed that his brother had been pulled over; he turned around; as he approached the police car, the driver's door was partially open and he could see the officer leaning "inside the squad car driver's door"; the door then opened all the way and he hit it. The statement did not mention that appellant had been looking at his dogs when he struck the door.

Appellant was charged with aggravated assault and battery. Section 6–2–502, W.S. 1977 (Cum.Supp.1987) He pled not guilty and requested a jury trial. At trial, the prosecution presented the testimony of three police officers and appellant's brother. The prosecution also introduced appellant's statement into evidence. In presenting appellant's defense, his attorney called two witnesses. One was appellant's brother. The other was a land surveyor who testified concerning the width of the road

where the collision occurred. The jury found appellant guilty as charged.

Appellant then appealed to this court, contending that his retained counsel rendered ineffective assistance because he failed to call appellant and two other witnesses to testify in appellant's defense. We remanded the case to the district court for an evidentiary hearing on appellant's claim of ineffective assistance of counsel. At the hearing, one of the witnesses not called at the trial, Rodney Hill, said that he would have testified at trial that he was present when appellant had allegedly threatened Officer Jongsma and that no threat was, in fact, ever made. The second witness not called at trial, Eric Olsen, said that he was an eye witness to the collision. He would have testified, contrary to Officer Jongsma's version of the incident, that just before the collision, the patrol car door swung to its fully-open position. He also would have testified that there was a station wagon coming from the other direction which would have precluded appellant from going into the opposite lane to avoid hitting the door. Appellant contends that the testimony of these witnesses, if believed, would not only have impeached the State's witness but "would have entirely exculpated appellant."

When evaluating claims of ineffective assistance of counsel, we use a standard of reasonableness. *Frias v. State*, Wyo., 722 P.2d 135 (1986); *Munden v. State*, Wyo., 698 P.2d 621 (1985). We apply this standard of reasonableness within the framework of the bipartite test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); *Frias v. State*, supra. The *Strickland* standard requires appellant to demonstrate that the performance of his attorney was deficient and that the deficiency prejudiced the defense of the case. *Gist v. State*, Wyo., 737 P.2d 336 (1987).

In order to satisfy the first prong of the *Strickland* test, deficient performance of counsel, appellant must show that his attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment to the

United States Constitution. *Id.* We conclude that appellant has failed to make this showing. In *Strickland,* the United States Supreme Court stated that when analyzing a claim of deficient performance,

"[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' See *Michel v. Louisiana,* supra, 350 U.S., [91] at 101, 76 S.Ct., [158] at 164 [100 L.Ed. 83 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

\* \* \* \* \*

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington,* supra, 104 S.Ct. at 2065–2066.

The *Strickland* court went on to say that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.,* 104 S.Ct. at 2066. In *Gist v. State,* supra, we noted that we support "the general proposition that a decision as to whether to call a particular witness is a matter of trial tactics properly committed to the discretion of counsel." *Id.,* 737 P.2d at 343.

It is clear that in this case the purported deficiencies in counsel's performance are not the result of inadequate investigation or preparation; instead, they fall into the "virtually unchallengeable" category of "strategic choices made after thorough investigation." *Strickland v. Washington,* supra, 104 S.Ct. at 2066. Cf. *Frias v. State,* supra; *Gist v. State,* supra. Appellant's trial counsel testified that he did not call appellant to the stand because he thought that he would not be a good witness and he thought that appellant's statement, which was introduced into evidence, adequately presented appellant's version of the incident. He did not call Rodney Hill as a witness because after two or three interviews, he was not sure whether Mr. Hill would testify that he had heard the entire conversation between Officer Jongsma and appellant when appellant allegedly threatened the officer. In addition, Mr. Hill was a good friend of appellant's. Mr. Olsen was not called because his description of the incident when interviewed before trial was not as vivid as his description

in the evidentiary hearing on remand. (It is an unexplained phenomenon that often, after conclusion of a trial and with passage of time, a witness' description of an incident becomes more colorful and detailed or certain.) Given these circumstances, we cannot say that the decision to refrain from calling the witnesses was unreasonable or "outside the wide range of professionally competent assistance." *Strickland v. Washington,* supra, 104 S.Ct. at 2066. We reject appellant's claim of ineffective assistance of counsel.

■ Turning to appellant's second issue, we agree that the trial court erred in requiring appellant to spend six months in the county jail as a condition to a delayed sentence. In pertinent part, § 7–13–203, W.S.1977, provides:

"If the court is satisfied that he was a person of good reputation before the commission of the offense charged and had never before been convicted of any felony, and that if permitted to go at large would not again violate the law, the court may in its discretion, by an order entered of record, delay passing sentence and then parole the person and permit him to go at large upon his own recognizance, conditioned that he will personally appear and report to the court twice in each year at times and places fixed in the order and that he will demean himself while at large in a law-abiding manner and live a worthy, respectable life, and that he will not leave the state without the consent of the court."

In sentencing appellant, the trial court concluded that "the passing of sentence herein should be delayed pursuant to W.S.1977, § 7–13–203" and ordered that appellant be placed upon supervised probation[1] for a

period of not less than one year nor more than five years subject to the condition, among others, that he be "remanded to the custody of the Natrona County Sheriff's office to serve a term of six (6) months."

In *Sorenson v. State,* Wyo., 604 P.2d 1031 (1979), we said that "[t]here can be no incarceration in connection with the status of the defendant under [§ 7–13–203]." Id. at 1038, n. 6. In light of this statement, the State understandably concedes that § 7–13–203 does not allow incarceration as a condition of a delayed sentence.

If part of a divisible sentence is illegal or improper, we may modify it by vacating or striking that part which is illegal and improper and affirm the balance. *Sorenson v. State,* supra. Accordingly, we strike the requirement of six months incarceration.

Appellant's conviction is affirmed, and his sentence is affirmed as modified.

CARDINE, J., delivered the opinion of the court.

URBIGKIT, J., filed a dissenting opinion in which MACY, J., joined.

URBIGKIT, Justice, concurring in part and dissenting in part.

I agree with the court that an illegal sentence was imposed, and disagree that the abject failure of adequate representation effectively portrayed in factual analysis in this case meets the reasonableness tests of our precedent in *Frias v. State,* Wyo., 722 P.2d 135 (1986), and of the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).[1]

---

1. In *Sorenson v. State,* Wyo., 604 P.2d 1031 (1979), we observed that the proper status of a defendant under § 7–13–203, W.S.1977, is "probation" rather than "parole."

1. Following trial, conviction, sentence, and commencement of appeal, appellant, through different counsel, filed a motion in this court to supplement the record because the record on appeal failed to disclose the potential testimony of two defense witnesses.

After responsive opposition by the Attorney General, an order was entered by this court

denying the motion to supplement the record, but ordering that this motion should be considered in the nature of a petition for writ of certiorari. Thus, an additional hearing was ordered to consider the question of inadequate representation.

A hearing was then held in district court where appellant and his two witnesses testified and were cross-examined, as well as prior counsel for defendant who was called as a witness for the State.

A decision letter with a formal order followed, which constituted the decision from

For specificity and thoughtfulness on effectiveness of counsel, one could providently look to the logic of the most approved-of justice of our time, Justice Brennan, who wrote in dissent in *Wainwright v. Sykes,* 433 U.S. 72, 113–114, 118, 97 S.Ct. 2497, 53 L.Ed.2d 594, *reh. denied* 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977):

" * * * Especially with fundamental constitutional rights at stake, no fictional relationship of principal-agent or the like can justify holding the criminal defendant accountable for the naked errors of his attorney. This is especially true when so many indigent defendants are without any realistic choice in selecting who ultimately represents them at trial. Indeed, if responsibility for error must be apportioned between the parties, it is the State, through its attorney's admissions and certification policies, that is more fairly held to blame for the fact that practicing lawyers too often are ill-prepared or ill-equipped to act carefully and knowledgeably when faced with decisions governed by state procedural requirements.

* * * * *

" * * * For almost 40 years it has been established that inadequacy of counsel undercuts the very competence and jurisdiction of the trial court and is always open to collateral review. *Johnson v. Zerbst,* 304 U.S. 458, 82 L.Ed. 1461, 58 S.Ct. 1019 (1938)."

The principal posture frequently stated and not so frequently pursued, which I would place within Wyoming Constitutional provisions of Art. 1, § 10, as well as federal law, embraces the recognition that the right to counsel is a right to effective assistance of counsel. See *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Howell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.2d 158, 84 A.L.R. 527 (1932). The recognition and effectuation of a constitutional liberty interest requires more than noneffectuated expression, and the concern is admirably and adequately stated by Justice Marshall in dissent in *Strickland v. Washington,* supra, 466 U.S. at 712–713, 104 S.Ct. at 2077–78:

"In defining the standard of attorney performance required by the Constitution, the majority appropriately notes that many problems confronting criminal defense attorneys admit of 'a range of legitimate' responses. Ante, [466 U.S.] at 689 [104 S.Ct. at 2065]. And the majority properly cautions courts, when reviewing a lawyer's selection amongst a set of options, to avoid the hubris of hindsight. Ibid. The majority goes on, however, to suggest that reviewing courts should 'indulge a strong presumption that counsel's conduct' was constitutionally acceptable, ibid.; see ante, at 690, 696, [104 S.Ct. at 2066, 2069], and should 'appl[y] a heavy measure of deference to counsel's judgments,' ante, at 691 [104 S.Ct. at 2066].

"I am not sure what these phrases mean, and I doubt that they will be self-explanatory to lower courts. If they denote nothing more than that a defendant claiming he was denied effective assistance of counsel has the burden of proof, I would agree. See *United States v. Cronic,* [466 U.S. 648, 658, 104 S.Ct. 2039, [2046] 80 L.Ed.2d 657 (1984) ]. But the adjectives 'strong' and 'heavy' might be read as imposing upon defendants an unusually weighty burden of persuasion.

which this appeal is presented, in which letter the trial court found:

" * * * that counsel was notified of two prospective witnesses for the defense, that he thoroughly investigated the matter and, after deliberation, decided for tactical reasons that the witnesses would not be effective and might tend to lend more weight to the state's case. There is no evidence that counsel fell below any recognized professional standards nor that he proceeded otherwise than in a diligent manner. The defense relies upon the case of *Gomez v. Beto,* 462 F.2d 596 [ (5th Cir.1972) ]. In that case, the only possible defense was one of alibi. Defense counsel failed to investigate the defense and made no inquiry of potential alibi witnesses. That is considerably different from this case where counsel did investigate, talked to the witnesses, and reached a decision after thoughtful deliberation.

"Therefore, the Court finds that the claim based upon ineffective assistance of counsel should be denied."

If that is the majority's intent, I must respectfully dissent. The range of acceptable behavior defined by 'prevailing professional norms,' ante, [466 U.S.] at 688 [104 S.Ct. at 2065], seems to me sufficiently broad to allow defense counsel the flexibility they need in responding to novel problems of trial strategy. To afford attorneys more latitude, by 'strongly presuming' that their behavior will fall within the zone of reasonableness, is covertly to legitimate convictions and sentences obtained on the basis of incompetent conduct by defense counsel."

I do not believe that we of the state judiciary should abandon the Wyoming Constitution to the minimum federal standard of ignored or disregarded ineffectiveness of counsel implicit in characterization of trial tactics by indulgence in strong presumptions or intercession of unchallengeable categories of strategic choices. I do not find this posture either mandated or justified in *Frias v. State,* supra, or *Gist v. State,* 737 P.2d 336 (1987). My view accords with the conclusion in the extensive analysis in Comment, *Ineffective Representation as a Basis for Relief From Conviction: Principles for Appellate Review,* 13 Colum.J.L. & Soc. Probs. 1, 89–90 (1977):

"Ineffective representation has proven to be a burgeoning problem in recent years, with a multiplicity of causes and a variety of ramifications. * * *

"Cosmic views of the shortcomings of our legal system should be avoided when an appellate court considers a claim for relief from conviction based on a denial of the right to effective representation. Courts should aim instead at a disposition of the individual case which is at once sensible and fair. A framework of carefully constructed legal principles is essential to achieving that goal. But cases are not disposed of by rules alone. The adjudication of an ineffectiveness claim is largely a matter of judging the facts of a particular case. Just as the defense of a criminal case is a complex process involving a myriad of decisions, judging an ineffectiveness claim on appeal requires sensitivity to and awareness of many different factors. Ineffectiveness is not only a matter of particular, identifiable errors. It often involves a systemic mediocrity which infects the entire defense. When and how that occurs may be difficult to determine. But the integrity of our judicial system rests, in many instances, on the ability of our appellate courts to arrive at an answer to that question."

See also Schwarzer, *Dealing With Incompetent Counsel—The Trial Judge's Role,* 93 Harvard L.Rev. 633, 637 (1980):

"As Justice Brennan observed in his dissent in Wainwright v. Sykes, we 'traditionally have resisted any realistic inquiry into the competency of trial counsel,' preferring instead 'to indulge the comfortable fiction that all lawyers are skilled or even competent draftsmen in representing the fundamental rights of their clients.' The facts refute this fiction. Putting aside the cases of marginal performance or simple human error, trial counsel at times perform with such manifest incompetence that litigants' rights are prejudiced. When that occurs, the adversary process has effectively ceased to function."

Professor Lawson, in *Presuming Lawyers Competent to Protect Fundamental Rights: Is it an Affordable Fiction?,* 66 Ky.L.J. 459, 476 (1978), analyzed a course of detailed cases in his state, and inquired:

" * * * whether our performance in the processing of criminal controversies, and perhaps even our competence for the task, is less than should be expected in a matter of such importance."

Wyoming adjudicatory experience is at best of moderate persuasion. Too often we have seen good, simple rules, fairly stated and easily understood, become encrusted with peripheral supplementation, causing confusion and destroying validity. An uncomplicated but explicit rule including the minimum criteria of *Strickland* for reversible error in counsel ineffectiveness would embrace a demonstration of the *sufficiency measured by reasonableness, with the burden of proof on defendant to show that a reasonable probability of prejudice*

had resulted. *State v. Lee,* 142 Ariz. 210, 689 P.2d 153 (1984). Cf. *United States v. Porterfield,* 624 F.2d 122 (10th Cir.1980), with *United States v. Payne,* 741 F.2d 887 (7th Cir.1984); *State v. Arledge,* Mont., 741 P.2d 781, 784 (1987).

Such a rule is simple and easily applied in the context of responsibility for conduct standards which are the measuring stick for professional conduct and liability. To be eliminated are the self-fulfilling exclusions serving empirically to deny relief in result-oriented adjudication. I conclude that the second character of *Strickland,* "prejudice," amply serves to differentiate harmless error where post-trial asserted negligence is from legal performance lacking justification as "reasonably * * * rendered by a reasonably competent attorney under the facts and circumstances of the case." *Hoskovek v. State,* Wyo., 629 P.2d 1366, 1367 (1981). Further clarification by an obscenely illogical presumption of due care or justification of mistake or defect as trial tactic or strategic choice defeats reason, morality, and constitutional guarantees.[2]

Accepting the *Frias* standard of this court, or for that matter the *Strickland* standard, as correct, I do not accept the present conclusion as applied to this criminal trial of Anthony Laing. Essentially, in justification to affirm, the majority conclude that the first prong of the *Strickland* standard, the performance component, is not met because the defense attorney's actions on whether to call two witnesses and the defendant were strategic choices, solely committed to the discretion of trial counsel. While it is recognized that the general rule on calling witnesses may be to normally treat it as a matter of trial tactics which may be committed to the discretion of trial counsel, this court recently has recognized that failing to call a witness was ineffective assistance when the testimony was of a critical nature and the defendant's chances of acquittal would have been materially enhanced. *Gist v. State,* supra, 737 P.2d at 343. Witnesses are of the essence in trials, and without witnesses there may be no bona fide justice adjudication.

Usually a claim of neglect to investigate or locate witnesses is tied to a failure to call witnesses, with resulting counsel ineffectiveness to be found. *Kimmelman v.*

**2.** Until *Frias v. State,* supra, the litany of recent Wyoming cases on ineffective assistance of counsel consisted essentially in denied relief. *Galbraith v. State,* Wyo., 503 P.2d 1192 (1972), failure to "object to the admission of evidence which may be technically questionable," using the since discarded "mockery, sham, or farce" criteria; *Ash v. State,* Wyo., 555 P.2d 221, *reh. denied* 560 P.2d 369 (1977), *cert. denied* 434 U.S. 842, 98 S.Ct. 139, 54 L.Ed.2d 106 (1977), the court denied continuance so that competency in the sense of application of that ability to the particular case was not possible; *Gallup v. State,* Wyo., 559 P.2d 1024 (1977), failure to call witness as determined by appellate court deemed not to be crucial as may have been waived by the client in absence of demand; *Johnson v. State,* Wyo., 562 P.2d 1294 (1977), counsel representing the criminal defendant had the power to control the proceeding and whether defendant testifies is a trial tactic; *Adger v. State,* Wyo., 584 P.2d 1056 (1978), reversal for inadequate time to prepare after retained counsel withdraws, as contrary in decision to *Ash v. State,* supra, causing Rose, J., in concurrence to have concern not for the result but for the pattern it provides for the future; *Hoskovek v. State,* supra, 629 P.2d at 1267, after stating a fair rule, and adding, "there is a presumption that counsel is competent and he performed his duty," where counsel neither adequately investi-

gated nor appraised a defense of mental competence, capacity, and legal sanity by a justification stated, " 'But the command of the Constitution is for a battle, not a victory' "; *Spilman v. State,* Wyo., 633 P.2d 183 (1981), failure to have voir dire or opening and closing statements recorded; *Munden v. State,* Wyo., 698 P.2d 621 (1985), failure to give an opening statement, develop the theory of the case, object to juror fatigue, or move for a new trial, as in that case generally justified as trial strategy.

It could likely be that most or all of these cases, except *Ash v. State,* supra, were properly decided as result-oriented conclusions. Unfortunately, as Justice Rose so effectively discerned in *Ash v. State,* 584 P.2d at 1063, quoting from Roscoe Pound, The Formative Era of American Law, at 120 (1938), as then applied to only one case but now to be applied generally:

" '... The necessity of weighing not merely the grounds of its decision, but the exact words in which those grounds are expressed, with reference to their possible use in other cases and thus of foreseeing within limits their potential analogical applications, is perhaps the gravest of the burdens involved in the crowded dockets of modern American appellate courts.' "

*Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir.1987); *Eldridge v. Atkins,* 665 F.2d 228 (8th Cir.1981), *cert. denied* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982); *Gomez v. Beto,* 462 F.2d 596 (5th Cir.1972). While not properly investigating or preparing is certainly not effective representation, a right to effective assistance of counsel also requires a proper presentation of the evidence. Even more egregious is when, as in this case, the attorney is aware of the crucial evidence and then arrogantly concludes that he does not need the defendant or the two eyewitnesses to testify for him to win the case. See comprehensive analysis in Sevillan, *Investigating and Preparing an Ineffective Assistance of Counsel Claim,* 37 Mercer L.Rev. 927 (1986).

Trial counsel in criminal cases should recognize that brilliance or bluff in defense strategy is no substitute for a comprehensive presentation of facts and events as a panorama of the defendant's defenses. This is an unhappy example of a lawyer's effort to win on the weakness of the prosecution without utilizing the assistance of the psychologically pervasive benefit of giving the jury the other side of the story. Axiomatic in analysis is that decision to deny countervailing evidence in defense converts the decision from a jury evaluation of the validity of the client's contentions, to an adjudicative test of aptitude of counsel as the sole determinant. *United States v. Tucker,* 716 F.2d 576, 585 (9th Cir.1983); *Wilson v. Cowan,* 578 F.2d 166 (6th Cir.1978). It is no longer the client's trial, and in such test, only too often the attorney will lose. Juries are in composite intelligent, thoughtful, and perceptive, and in denial of favorable evidence justify their conclusion that no beneficial information can be produced.

It is especially atrocious in this case where the attorney decided that the jury did not need to hear any testimony from the three individuals when all of them were present in the courtroom throughout the trial. Consequently, even if the attorney consciously made a reasonable, strategic decision not to call them initially, after losing two motions to dismiss and hearing the State's case he still could have re-evaluated the situation and without even the delay of subpoenaing a witness or asking for a continuance, properly proceeded with his case by introduction of the relevant and probably persuasive testimony.

Defense counsel here simply did not render constitutionally adequate services. The jury unfortunately only had to weigh the State's eyewitness and other witnesses with the defense attorney's false pride in his litigation skills, presented by a land surveyor who measured the road but did not see the collision, and the defendant's brother who testified he could not see the impact. In result, the "strategy" foreordained conviction.

By the very nature of this case, it had to come down to a credibility decision. The jury was confronted with the defendant's theory of the police officer opening his door into the traffic lane and the defendant accidentally hitting his door, or the police officer's testimony that the defendant, who the officer alleged previously had threatened him, lined up his vehicle and intentionally ran into his car door. The believability of the witnesses became the key. The testimony of the two eyewitnesses and the defendant should have been presented to the jury because "[c]redibility was of major importance." *Nealy v. Cabana,* 764 F.2d 1173, 1179 (5th Cir.1985). If believed, defendant is acquitted; if not, the jury function is exercised. *United States ex rel. Cosey v. Wolff,* 562 F.Supp. 140 (1983), *aff'd* 727 F.2d 656 (7th Cir.), overruled on other grounds by *United States v. Payne,* 741 F.2d 887 (7th Cir.1984). Defense counsel here usurped the jury's function by denying them the opportunity to exercise a fact-finding role, and was not functioning in providing representation as guaranteed by the Sixth Amendment to the United States Constitution.

Through the post-conviction hearing held upon remand by this court, we are afforded a fairly clear detail of the available testimony. The uncalled eyewitness to the accident, Eric J. Olsen, who attended the entire session at the request of Laing and his

attorney,[3] testified as to his observations at the scene and then as to his anticipated appearance as a witness.

"Q.  Go ahead and describe to the Court how you became acquainted with Tony.

"A.  Well, talked to him about how I had been following him and seen the accident and that, and he asked me if I would be willing to talk to his attorney and tell him what I saw, that is where he got me in contact with [the attorney], and I told him what I saw.

"Q.  You told who what you saw?

"A.  I told [the attorney], came to the courthouse and told him.

[We cannot tell whether this witness was interviewed in advance of trial.]

"Q.  And what happened as a result of that information being told to [the attorney]?

"A.  He asked me if I would come to the courthouse and if necessary be on the stand and testify to that, and I said, yes, I would.

"Q.  And then what occurred after that?

"A.  Nothing.

"Q.  Did you come to the courthouse?

"A.  Yes, I did come to the courthouse, never was—

"Q.  Were you present during Tony Laing's trial?

"A.  Yes.

"Q.  Were you called as a witness?

"A.  No.

"Q.  Did you ever try to find out why you weren't called as a witness?

"A.  I asked [the attorney], and he just told me that they might think it was a little strange, look too much like buddy-buddy, and I didn't even know Tony at the time.  I thought that was a little strange.

"Q.  Did he say anything else to you?

"A.  No, really not at that particular time.

"Q.  Did he say anything to you at any other time after that?

"A.  Well, he wished he would have put us on, later we were out at Paradise having a cocktail, he said he wished he would have put us on."

The other witness, Rodney Cuyler Hill, an eyewitness to an earlier contact between the police officer and Laing, described events in direct contradiction to the prosecuting police officer, and then testified about his appearance for trial.

"Q.  Were you called to testify in this case?

"A.  Yes, I was here [at trial] but wasn't called to the stand.

"Q.  Is there some reason that you know of why you weren't called to testify?

"A.  Just that I understood it was, you know, that he thought it wasn't necessary.

"Q.  That who thought it wasn't necessary?

"A.  [Defendant's attorney].

"Q.  How did you understand that?

"A.  From what, I was with Eric Olsen and the conversation I overheard him tell Eric he didn't feel it was necessary to have us come on the stand.

"Q.  Did [the attorney] say anything further to you after that particular conversation?

"A.  I was with, out at Paradise Liquors, after the trial when [the attorney] then said he wished he had brought us on the stand."

And then in cross-examination by the prosecuting attorney:

"Q.  Now, before the trial did you ever have occasion to discuss what you knew with [the attorney]?

"A.  Yes, I did.

"Q.  How many times?

"A.  I was in his office two or three times to talk to him.

---

3.  A partial explanation of the designation of the practice of law is that progress continues in a lifetime learning experience.  Consequently, I depersonalize, with the confidence that the same problems will not recur with the same attorney.  Unfortunately, Anthony Laing's liberty interest and search for justice as now a convicted felon cannot be simplistically ignored.  By this court's decision, he joins the approximately one of 38 adults among us who is a "convict."

"Q. When was the last time before the trial, approximately, if you recall?

"A. Maybe four days.

"Q. And at that time at that last meeting, did [the attorney] indicate to you whether he would be calling you as a witness?

"A. Yes, he asked me to be here.

"Q. Did he say he was going to put you on the stand?

"A. Yes, he did.

"Q. Now, have you had any conversations with [the attorney] after the trial other than the ones where you were present with Mr. Olsen?

"A. No, I hadn't.

"Q. And again was he also talking to you when he said he didn't put you on because it looked like you were too good a friend and might not look good?

"A. I was there when that was said, I don't know if he was directing it to me or Eric."

Then called to that post-trial proceeding, Laing testified in regard to his own trial testimony:

"Q. I would like to direct your attention back to your trial in this matter. Were you called as a witness to testify on your own behalf in your trial?

"A. No, sir.

"Q. Would you describe in detail why it is your understanding you were not called as a witness?

"A. Well, it was, I guess, because [my attorney] thought it was an open and shut case, and he didn't need to put me on the stand. He thought it was a bogus charge and really no evidence to convict me, so he didn't put me on the stand.

"Q. Did you talk to [your attorney] about you testifying?

"A. Yes, sir.

"Q. And it was discussed with reference to that?

"A. That he really didn't need to put me on the stand, and he discussed it would be best I didn't get on the stand.

"Q. Did you want to testify?

"A. Yes.

"Q. You have given some statement, Mr. Laing, that says, that indicates and uses the word 'we' decided that I shouldn't testify, 'we' decided that it wouldn't be necessary. Would you describe to the Court what you meant by the use of that term?

"A. Well, my lawyer made the decision, * * *, and that is what I hired him for, and so I just agreed with him because I thought his judgment would be right."

And in regard to the other witnesses:

"Q. Did you discuss with him the possibility of calling Mr. Olsen and Mr. Hill to the stand?

"A. Yes, sir.

"Q. And again, did you discuss that on more than one occasion?

"A. Yes, sir.

"Q. And did he explain to you the good things and bad things that could happen if those two gentlemen were put on the stand?

"A. No, sir.

"Q. Did he ever discuss with you the fact that it might look bad, might look just like your friends vouching for you?

"A. No, sir.

"Q. Did he ever discuss with you the fact that your testimony would not vary much from what you told the police officers after the accident?

"A. Pardon?

"Q. Did he ever talk to you about the statement you gave to the police officers—

"A. Yes.

"Q. —after the accident?

"A. Yes.

"Q. And isn't it true that what you had to say was basically contained in that statement?

"A. No, sir.

"Q. And did you discuss—did you tell [the attorney] you wanted to testify?

"A. Yes, sir.

"Q. Did he say you couldn't?

"A. No, sir, he thought I shouldn't, he didn't think he needed me.

"Q. But he did not say you could not testify, did he?

"A. No, he did not say I couldn't."

The defendant's prior attorney, *called as a witness for the State in the hearing*, explained:

"Q. And were you aware of the possible testimony of Mr. Hill and Mr. Olsen, who testified here today?

"A. Was I aware on the—at the time of trial?

"Q. Yes.

"A. Yes, I was.

"Q. And when did you first become aware of Mr. Olsen's testimony concerning the accident?

"A. Heard about the testimony of both individuals, Mr. Olsen and Mr. Hill, from either Tony or his brother, Rob Laing, and I am not sure when, but it was, I am not sure when it was, I wasn't initially in the first Municipal Court charge of assault or reckless driving, which he was charged with. It was sometime after and I don't have that day.

"Q. Now, did you interview those witnesses?

"A. Yes, I did.

"Q. And they were not called at the trial, is that correct?

"A. That is correct.

"Q. Could you explain to the Court why you made the decision not to call those gentlemen?

"A. In the course of the trial, I tried to discuss some of the decision making with my client in this case, my client and his brother, but I made the recommendation clearly to Tony that those two individuals not be called. Recounting all of the reasons now, I don't know if I can, but I made a judgment in each case. One, for Mr. Olsen, why I were in Tony's shoes, would not call him. I mean a separate judgment with respect to his friend Rodney Hill, why I would not call him. But they weren't the one judgment for both individuals. They were in the courtroom and very much together all those times.

"Q. As to Mr. Olsen, is there a tactical reason that you felt he should not be called?

"A. Yes, it was a tactical, it was a legal tactical reason. Part it was a series of reasons, and I don't know if I will capture them all. One is how he came to me, by what means. Two, at the time he came to me. Three, I don't recall and I didn't take down his interview with me or transcribe it with a court reporter, but I don't recall his vividness of the occurrence of the accident quite as vivid as he would relate it this morning.

\* \* \* \* \*

"Q. Okay. Did you have some reasons, tactically that you would not feel it was necessary or desirable to call Mr. Laing to the witness stand?

"A. I discussed with Tony that I didn't think he would be the best witness in any kind of case, that is something we think as lawyers we know better than those who are merchants or farmers, but some people make better witnesses to intersection accidents than others. I discussed with Tony he might not make a good witness, I discussed with Tony that he had given a rather full testimony about the events on the day of the accident in July of '85 by giving his statement openly and freely to Officer Jim Cooper, as he knew he had given it freely, and had nothing to hide when he gave it. I thought that that testimony would not have changed on the witness stand with respect to those facts as contained in that statement. I haven't, I don't know of any facts that would change from that statement that he gave, and we were, after discussing with other counsel, I intended to rely on that statement for Tony Laing's presentation of his defense. It was a two page, legal size handwritten statement.

"Q. And at any point during your handling of this case, did you develop a certain theory as to the strength of the prosecution's evidence?

"A. Yes, I did.

"Q. And what was that, how strong did you believe the case was?

"A. Well, I think, first lose sight of the forest for the trees, but didn't think the case should have been bound over for trial from the county court level, and it

didn't change as we went through some motions, and went through the week before trial, and the testimony to take it away from trial position, it didn't change as to the State's case at trial.

"Q. Did you ever entertain the theory that presenting evidence or presenting a defense would give credence to a weak case?

"A. I am sorry, I didn't catch that.

"Q. Did you ever consider the theory that presenting a case, presenting evidence, and presenting the defendant may act to give credence to an otherwise weak State's case?

"A. I don't know how to answer that. I just didn't frame it that way, Counselor.

"Q. Anything similar that you could frame it in your own words?

"A. I simply thought we, at defense table, stood in better shoes if we were not calling Tony or the two witnesses, each for specific reasons."

To understand this case, we need to further review what happened. In opening statement, defense counsel had detailed the favorable background and history of Laing although they were never proved *in any trial evidence*. Laing's brother was called as a prosecution witness, but in cross-examination nothing about defendant's good character was raised. Then Rob Laing was recalled by defendant, and the inquiry of the available witness afforded nothing of benefit to defendant.

"Q. Good morning, Rob. You were asked yesterday about a statement you gave to the Casper Police Department. Do you recall that statement?

"A. Yes, sir.

"Q. Was there a tape machine recording your statement?

"A. Yes.

"Q. Where was that statement taken?

"A. It was taken in an interview room over in the police department.

"Q. Was it taken by Casper Police Department personnel?

"A. Yes, it was taken by Brad Blissett.

"[THE ATTORNEY]: That's all the questions I have. Thank you." [4]

The defense attorney failed to present favorable information, either through defendant or some other member of the family, even though announced in opening statement that he would do so. After conviction, the volume of favorable documents presented for sentence consideration about the character of the defendant included 18 separate, very favorable communications. This meant that the unsustained and unproved allegations of his attorney in opening statement were the only good-character proof available for Laing's benefit despite clearly available witnesses.

Furthermore, a comment made by defense attorney in opening statement compared to his later testimony in post-conviction explanation is disturbing as being directly contrary to the decisional process sworn to by him in post-conviction hearing:

"As I mentioned to you the Defendant will not be calling in any eye witnesses, people investigated this accident, primarily police officers. I hope you don't expect us to bring in a lot of witness to put together a case for you. The facts are there, how you will interpret those."

Then in post-conviction sworn testimony justification, he said, "In the course of the trial * * *." Without question, the record not only portrays an absurdly directed and ineptly applied trial performance, but also an absence of candor after the proclaimed strategy misfired.

Ultimately, the focus under the Wyoming Constitutional criteria, or in *Strickland v. Washington*, supra, 466 U.S. 668, 104 S.Ct. 2052, as applying the similar but not necessarily identical principles of the United States Constitution, must be on the fundamental fairness of the proceeding, the result of which is being challenged, since no mechanical rules on prejudice can apply. *Nealy v. Cabana*, supra, 764 F.2d at 1179. Since the missing witnesses' testimony would contradict the police officer's testi-

---

**4.** The only other defendant's witness called was a land surveyor who testified to measurements at the scene of the occurrence.

mony and support Laing's theory of the case, Laing has met his burden of showing that the decision reached could reasonably have been different absent the errors required by Strickland, supra. This evidence, consisting of the missing witnesses' and defendant's testimony, was of sufficient gravity to undermine the fundamental fairness of the proceeding.

Defense counsel asserts that he decided not to put on the witnesses because the State's evidence was slight. I wonder if he would have justified this gamble if his own liberty interest had been at stake. He felt he was justified in putting on this so-called but actually nonexistent defense; here, though, he equivocated in admitting that he failed to call the witnesses so as not to give credence to the State's weak case. When applying the prejudice prong of Strickland, counsel's errors must also be evaluated in light of the strength of the State's case. *Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir.1986). Clearly, "if the state has a strong case, and the error would not substantially weaken it, prejudice would not result." *Walker v. Lockhart,* 807 F.2d 136, 140 (8th Cir.1986). A verdict derived from a weak State's case is more likely to be affected by errors than one with overwhelming support. *Strickland v. Washington,* supra; *Lufkins v. Solem,* 554 F.Supp. 988 (D.S.D.), aff'd 716 F.2d 532 (8th Cir.1983), *cert. denied* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984); Annot., 26 A.L.R.Fed. 218, and Supp. at 24.

In considering the totality of the evidence and the effect of defense counsel's errors in not calling the two eyewitnesses and the defendant, I would hold that the defendant has met his burden of showing prejudice. Just because the State may have a weak case does not mean a defense attorney can sit back and basically pass up presenting a defense, and later raise the shield of trial tactics when through inaction or stupidity he has lost the case. An attorney's discretion is not limitless. His failure to act on behalf of his client's best interests deprives his client of effective counsel. *Nutall v. Greer,* 764 F.2d 462 (7th Cir. 1985).

" * * * Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective. As the court in *Beasley v. United States* noted:

" 'Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial. [Citation omitted]' 491 F.2d 687, 696 (6th Cir.1974)." *United States v. Tucker,* supra, 716 F.2d at 586.

See extensive case citations at 3 Wharton's Criminal Procedure § 416.

The defense attorney claims that one of the eyewitnesses, Rodney Hill, was a friend when the supposed threat episode took place, and that the other eyewitness, Eric Olsen, later became a friend, and that it would therefore have looked like friends just vouching for friends. One could wonder what counsel expected: angels to descend as applied trial witnesses? While the prosecuting attorney would in all likelihood have raised the possible bias of those individuals, it was for the jury and not defense counsel to decide how much credence to give their testimony. *Crisp v. Duckworth,* 743 F.2d 580, 585 (7th Cir.1984), *cert. denied* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed. 2d 361 (1985).

" * * * Counsel need not attain perfection, but he must exercise reasonable diligence to produce exculpatory evidence." *Eldridge v. Atkins,* supra, 665 F.2d at 235.

" * * * While it is true that a reasonably competent lawyer must be concerned with keeping the theory of his case before the jury, he must also provide factual support for that defense where such corroboration is available." *United States v. Tucker,* supra, 716 F.2d at 594.

The Tenth Circuit Court of Appeals observed in *United States v. Dingle,* 546 F.2d 1378, 1385 (10th Cir.1976):

"It is error not to call a witness when that witness would present the only de-

fense available. *Gomez v. Beto*, 462 F.2d 596 (5th Cir.1972)."

Defense attorney's actions in the instant case resulted in an attempt to present a defense of accident, without use of available witnesses, by cross-examination and unsupported opening and closing argument. In this regard, the case at bar is similar to *Code v. Montgomery*, 799 F.2d 1481 (11th Cir.1986), where ineffective assistance of counsel was found where counsel attempted to present an alibi defense without alibi witnesses. A decision to forego the available defense, as occurred here, can fall below Sixth Amendment standards and deny fulfillment of Art. 1, § 10 of the Wyoming Constitution. *Keys v. Duckworth*, 761 F.2d 390, 392 (7th Cir.1985); *Young v. State*, Fla.App., 511 So.2d 735 (1987).

I do not suggest that an attorney, to avoid being ineffective, should call to the stand every possible witness the defendant might consider. There are limits, such as when the testimony is cumulative. *Weaver v. State*, Minn.App., 408 N.W.2d 200, 202 (1987). This is not a case where perjuring or ineffective witnesses should not be called nor a case involving a cumulative witness decision, since a no-witness strategy was actually pursued.[5] Defense counsel claimed he advised the defendant not to testify because he would not make a good witness, and his testimony would not have changed on the stand from the statement he gave the police. While not articulating it as such, defense counsel concluded that Laing's testimony would have been just cumulative. Yet it is interesting to note that defense counsel, before he even presented his case, got the interviewing officer on cross-examination to admit that things discussed in the interview had been left out of the report. It seems highly unlikely that this document, which was so incomplete in the defense attorney's own mind, could present adequately to the jury the whole theory of the defendant's side of what happened that day. Again, experience demonstrates that in most cases, if defendant does not testify he will be convicted, and certainly more often than if he does testify, despite constitutional right to refrain.

While the decision to testify is the defendant's, I find it unfathomable that a defendant would be advised not to testify and would not be called to give his side of the critical events, especially so when the defendant had no criminal record raising vulnerability to impeachment. We are led to believe in counsel justification after the disastrous trial conclusion, that the defendant was advised not to testify because he had not been in the courtroom much before this case and apparently would not make a good witness. This explanation fits in between incredibility and absurdity to experienced trial counsel who know that you take witnesses as they come and prepare them as best you can for a novel and frightening experience. The jury still should have been given the opportunity to view his nervousness and accord it the weight it was due. Likewise, police statements do not serve as an adequate substitute for personal testimony as the medium which will be expected by the jury, *Crisp v. Duckworth*, supra, and here more clearly since that statement was not complete. Actually leaving defendant without a defense, his attorney relied instead on a no-evidence strategy[6]

---

5. In generic terms to the experience and effective trial counsel, knowledgeable witnesses are like gold—there is never enough.

6. I would characterize the atmospherically defined trial justification of strategy or trial tactics as committed to the discretion of defense counsel to the character of the result of the heart surgeon whose knife slips and the patient dies. The words mean nothing if the conduct does not meet the criteria of being within the range of competent legal representation. I particularly reject bad lawyering as a justification for conviction. This subject of ineffective counsel has

not been without analysis, including: Finer, *Ineffective Assistance of Counsel*, 58 Cornell L.Rev. 1077 (1973); Craig, *Ineffective Counsel in Texas and the Federal Courts*, 1 Am.J.Crim.Law 60 (1972); Strazella, *Ineffective Assistance of Counsel Claims: New Uses, New Problems*, 19 Ariz.L. Rev. 443 (1977); Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post–Conviction Relief in Criminal Cases*, 59 N.W.L.Rev. 289 (1964); Sevilla, *Investigating and Preparing an Ineffective Assistance of Counsel Claim*, 37 Mercer L.Rev. 927 (1986); Note, *Motion for New Trial Based on Newly Discovered Evidence and Effective Assistance of Counsel*, XXII Land and

which, when unconvincing to the jury when compared with the evidence the State presented, is now explained by the shield of "trial tactics." I can neither accept nor condone the practice or the post-failure justification.

I would reverse, since inadequacy of counsel is clearly demonstrated and a reasonable question of guilt exists when the evidence from uncalled witnesses is considered.

Water L.Rev. 598 (1987); Project, *Fifteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1984-1985*, 75 Georgetown L.J. 499, 757 (1986); Comment, *Criminal Law: Effective Assistance of Kansas Counsel*, 18 Washburn L.J. 635 (1979); Comment, *The Right to Effective Assistance of Counsel*, 42 Miss.L.J. 213 (1971); Comment, *Incompetency of Counsel*, 25 Baylor L.Rev. 299 (1973); Kaufman, *Attorney Incompetence: A Plea for Reform*, 69 A.B.A.J. 308 (March, 1983); " * * * [A] rule retroactively elevating the possibly negligent or inadvertent omissions of counsel to the exalted realm of dazzling strategic maneuvers whose Darrowesque brilliance not only perversely backfires against the accused in state court but also annihilates access to the federal habeas court * * *." Rosenberg, *Jettisoning Fay v. Noia: Procedural Defaults by Reasonably Incompetent Counsel*, 62 Minn.L.Rev. 341, 343 (1978);

" * * * Complaints based, for example, on the inadequate preparation of counsel for trial, his failure to raise a critical defense, his blunders in the conduct of trial or other comparable instances of neglect or error have long gone unredressed.
"It may be something of a puzzle to outsiders why lawyers, who demand so much of other professionals, ask so little of themselves." Bines, *Remedying Ineffective Representation in Criminal Cases: Departures From Habeas Corpus*, 59 Va.L.Rev. 927, 928 (1973);
" * * * This conclusory categorization [matter of judgment in trial tactics] deftly avoids the absorbing task of weighing crucial policy considerations. This standard's only advantage is that it enables a court to dodge problematic claims of ineffectiveness while clearly disposing of transparent ones." Lee, *Right to Effective Counsel: A Judicial Heuristic*, 2 Am.J. Crim.Law 277, 286-287 (1974).